**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **PARTNER ONE ACQUISITIONS INC.,** | : | **CIVIL ACTION** |
| **ASSIMA USA LLC** | : | |
| | : | |
| **v.** | : | **NO.  25-209** |
| | : | |
| **WHATFIX PRIVATE LIMITED,** | : | |
| **WHATFIX, INC.** | : | |

## MEMORANDUM

**MURPHY, J.**                                                    **January 27, 2026**

This patent infringement case involves two patents on a software development system that enables users to directly modify elements in a simulation of a software program (1) without affecting the underlying, actual software; and (2) in a manner that automatically updates all display screens containing that same element.  Whatfix moves to dismiss, asserting that claim 1 of each patent is invalid under 35 U.S.C. § 101 because both are directed to abstract ideas and lack an inventive concept.  We agree with Whatfix for the 007 patent and disagree for the 948 patent.  And we find that Assima's pre-suit letter provided more than enough notice to allege willful infringement.  But there is a wrinkle worth noting at the top.

Rather than tackle the sometimes-sticky issue of how to select a representative claim or otherwise address an assortment of claims, Whatfix's motion attacks only claim 1 of each patent. Whatfix argues that the complaint is limited to only claim 1 of each patent because it uses only those claims as examples for infringement allegations and then makes immaterial general allegations of infringement such as "one or more claims," "at least claim 1," "at least one claim," and the like.  Whatfix's gambit might work for a different complaint, but here, Assima's complaint clearly puts all claims of the 007 patent on the table.  Thus, only claim 1 of the 007 patent is dismissed, and the rest of the patent's claims stay in the case.

I.    **FACTUAL BACKGROUND**

Partner One Acquisitions Inc. (Partner One) and Assima USA LLC (Assima)[1] accuse

Whatfix Private Limited and Whatfix, Inc. (Whatfix) of infringing two U.S. patents: Nos.

8,087,007 and 9,285,948.  DI 1 at ¶ 2.  Assima procured the patents which, following Partner

One's 2019 acquisition of Assima, are assigned to Partner One.  *Id.* at ¶¶ 16-19.  These patents

pertain to "Assima Train" — a product Assima developed that "produces a fully interactive clone

of a [software] system" where all user interfaces are connected and which allows users, such as

employees or programmers, to engage with and modify the system's clone without affecting the

actual software program.  *Id.* at ¶¶ 15, 28, 31.

**A.    007 patent**

The 007 patent describes a system and method for developing and familiarizing users

with a software product through the creation of a modifiable simulation of the software that (1)

makes software coding a more efficient and less error-prone process; and (2) enables more

effective user training of that software.  *See, e.g.*, 007 patent at 1:28-2:19.  The invention seeks to

satisfy "a need in the art for" (1) "a system and method for increasing efficiency of software

development and modification with respect to developer and tester time"; (2) the "streamlining

[of] the interaction of the various contributors of the software development"; and (3) "a system

and method for streamlining software modification with training simulation updates."  *Id.* at

2:12-18.  It further provides for a system and method to validate software modifications — *i.e.*,

to ensure the desired change is achieved in the modified software application — through the

automatic comparison of the modified application's simulation content with the content of a

_____

[1] For brevity, we will use Assima when discussing plaintiffs' arguments.

modified simulation which contains the specifications for the desired software modification. *Id.* at 3:16-26. Additionally, the system and method enable the automatic updating of the simulation so that it remains current with the underlying software program. *Id.* at 3:27-36.

Claim 1 of the 007 patent — which neither party asserts is representative of all other claims, but which is the only 007 patent claim challenged as ineligible by Whatfix — recites:

> A computer application development method, comprising:
>
>> during, and based on, a first execution of a program, the first execution of the program including interaction with graphical user interface objects
>>
>>> automatically identifying, by a processor, at least one object class instantiation according to which a respective one of the graphical user interface objects is displayed and that is associated by the program with a program state obtained during the first execution of the program; and
>>>
>>> automatically storing, by the processor, in a first file a description of the identified at least one object class instantiation, wherein at least a portion of the first execution of the program is simulatable without execution of the program and based on the first file to display a sequence of graphical user interface screens in which the at least one respective graphical user interface object is displayed; and
>>
>> modifying the first file in response to a user interaction with a displayed one of the at least one respective graphical user interface object, wherein a modified version of the at least the portion of the first execution of the program is simulatable based on the modified first file.

007 patent at 22:26-49.

First, using the live software program, the user interacts with graphical user interface (GUI) objects — for example, the user types, clicks, or navigates through screens. 007 patent at 22:28-30; Fig. 2. The processor then automatically identifies the GUI object structures and how they are linked to the program state — for example, the processor recognizes that a "Login" and

3

"Password" text box belongs on the program's login screen. *Id.* at 22:31-36; Fig. 2. Next, the processor records those identified GUI object structures in a new simulation file — in the above example, the processor would save a new simulation file containing the login screen with the "Login" and "Password" text box. *Id.* at 22:37-39; Fig. 2. The user then can use that simulation file to replay part of the program's behavior, without running the real application — so, in our example, the user could play back the saved simulation file of the login screen without opening the actual software application. *Id.* at 22:39-44; Fig. 6; Fig. 9. Finally, the user can directly edit the simulated GUI objects — for example, they could click the simulation file "Login" button and rename it or change the location of the "Password" text box. *Id.* at 22:45-49; Fig. 6; Fig. 9.

## B.    948 patent

The 948 patent describes a system and method for software (1) prototyping; (2) tutorial development; and/or (3) reproduction and/or development of electronic performance support system (EPSS) objects. *See, e.g.*, 948 patent at 1:6-9. The invention seeks to enhance the "efficiency of software and training simulation development and modification" by providing a system and method that enables users to (1) create EPSS objects (such as "user help tips, warnings, and/or program behavior modifications"), which (2) respectively can be associated with different parts of a software application (such as GUIs), in a manner that (3) allows users to make centrally modifiable updates that easily can be reflected throughout the software application. *See* 948 patent at 2:15-27; 3:25-4:20. This invention streamlines and enhances the accuracy of the software development process — a process which is often lengthy, resource-intensive, and error-prone due to its collaborative and complex nature — while it also improves the training process for users learning a software program by ensuring that the software

simulation remains up-to-date vis-à-vis the actual software.  *See* 948 patent at 1:13-67; 2:1-13.

Claim 1 of the 948 patent — again, which neither party asserts is representative of all other claims, but which is the only 948 patent claim challenged by Whatfix — states:

A computer-implemented method, comprising:

responsive to a first application triggering event during execution of a computer program, the first application triggering event triggering a display of a first user interface display screen:

obtaining, by a computer processor, a first instantiation data structure including a pointer to a first screen template that is stored in a data storage accessible by the processor and that identifies a first plurality of user interface graphical objects;

processing, by the processor, the first instantiation data structure, the processing of the first instantiation data structure including obtaining and instantiating the first screen template pointed to by the first instantiation data structure; and

outputting, by the processor and in a display device, the instantiated first screen template; and

responsive to a second application triggering event during execution of the computer program, the second application triggering event triggering a display of a second user interface display screen:

obtaining, by the processor, a second instantiation data structure including a pointer to a second screen template that is stored in the data storage, points to the first screen template, and identifies or references a second plurality of user interface graphical objects;

processing, by the processor, the second instantiation data structure, the processing of the second instantiation data structure including obtaining and instantiating the second screen template pointed to by the second instantiation data structure, wherein the instantiation of the second screen template includes instantiating the first screen template; and

outputting, by the processor and in the display device, the instantiated second screen template.

948 patent at 17:47-18:15.

First, the user triggers the first screen in the live software program — for example, they open the "Customer Details" screen. *Id.* at 17:48-51; Fig. 1; Fig. 4. Next, the processor obtains the instructions for building that screen from a stored template — using our example, they get the saved layout for the "Customer Details" screen. *Id.* at 17:52-56; Fig. 1; Fig. 2; Fig. 4. Then the processor builds and shows a screen from the template — here, it outputs the "Customer Details" screen with all the user interface elements. *Id.* at 17:57-63; Fig.1; Fig. 2; Fig. 4. Then the user triggers a second screen in the live software program — for example, they open the "Order Summary" screen. *Id.* at 17:64-67; Fig. 1; Fig. 2; Fig. 4. Next, the processor obtains instructions for building the second screen by reusing the first template — again using our example, the processor loads the "Order Summary" template, which points to and uses the "Customer Details" layout. *Id.* at 18:1-5; Fig. 1; Fig. 2; Fig. 4. Finally, the processor builds and shows a second screen that includes the linked first template — for example, it outputs the "Order Summary" screen which includes the shared user interface elements and the content derived from the "Customer Details" screen layout. *Id.* at 18:6-14; Fig. 1; Fig. 2; Fig. 4.

## C.    Assima's infringement allegations

Assima alleges that Whatfix's product, called Mirror, is essentially a copy of Assima Train that infringes with respect to "at least claim 1" of each patent. DI 1 at ¶¶ 34-115. It further avers that Whatfix's infringement of the patents is willful. *Id.* at ¶¶ 116-24.

## II.    MOTION AT ISSUE

Whatfix moves to dismiss this case, asserting that both the 007 and 948 patents are invalid because they (1) are directed to an abstract idea under 35 U.S.C. § 101; and (2) lack an

inventive concept sufficient to transform the abstract idea into patent-eligible subject matter.  DI 20 at 7, 10-24 (applying the well-established § 101 test from *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014)).

Curiously, Whatfix solely focuses upon claim 1 of the respective patents but does not assert that either claim is representative.  Whatfix's tactic apparently requires us to accept that the case is limited to those two patent claims.  *Id.* at 10 n.1 (citations omitted).  In Whatfix's view, Assima's use of typical phrases like "at least claim one" and "one or more claims" in the complaint precludes assertion of any claims other than claim 1 of the respective patents.  DI 25 at 6-7 (citing *Hantz Software, LLC v. Sage Intacct, Inc.*, 2023 WL 2569956, at *1 (Fed. Cir. 2023)).  Additionally, Whatfix seeks dismissal because Assima failed to plausibly allege that Whatfix willfully infringed the asserted patents.  DI 20 at 25-28.  Finally, it asks us to deny Assima leave to amend.  DI 25 at 15.

Assima rejects Whatfix's characterization of Assima's complaint as solely asserting infringement of claim 1 of the respective patents, emphasizing that Assima alleged "infringement of 'one or more claims' of the asserted patents" and merely exemplified infringement using claim 1 of each patent.  DI 24 at 12.  Assima seizes upon Whatfix's decision to challenge only the two claims and argues that the other claims would require a different and separate § 101 analysis.  *Id.* (citation omitted).  It insists that the claims depending from the 007 patent claim 1 "provide additional concrete steps" such as "comparing simulation data in a modified file to the software program and generating a report indicating whether the simulation data and the modified first file match."  *Id.* (citation modified) (citing claim 6).  For the 948 patent, Assima asserts that the dependent claims from claim 1 "capture additional steps and improvements[]" to

enhance the technology, such as, for example, "executing a modification script to alter a screen template for display customization (Claim 2), modifying the script based on user input (Claim 3), constructing screens from multiple template instances to enable modular assembly (Claim 6), and sequencing template-based screen displays as part of a simulation playback (Claim 5)." *Id.* Moreover, Assima insists that it sufficiently pled willfulness and asks that, in the event that we identify any deficiencies in its complaint, we permit it leave to amend. *Id.* at 23-25.

## III. LEGAL STANDARDS

### A. The *Alice* test for patent eligibility under section 101

Patent eligibility encompasses "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. But the Supreme Court has imposed an exception to the statute: abstract ideas, laws of nature, and natural phenomena. *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013); *Alice*, 573 U.S. at 216 (2014). An accused infringer may rely on these exceptions as an affirmative invalidity defense. 35 U.S.C. § 282(a)-(b). To prevail, the accused infringer must convince us that the challenged claim is ineligible under the Supreme Court's two-step patent eligibility test — developed in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012), and further articulated in *Alice*, 573 U.S. 208 — known as the *Alice* test. *Alice*, 573 U.S. at 217; 35 U.S.C. § 282(a). The patent eligibility question may be, and often, resolved via a Rule 12(b)(6) motion in situations "where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018)

(citations omitted).

Under *Alice* step one, the accused infringer must demonstrate that the claim at issue is "directed to a patent-ineligible concept[,]" — such as, as is relevant here, an abstract idea. *Alice*, 573 U.S. at 218. Examples of abstract ideas include algorithms, mathematical formulas, intermediated settlement, and the concept of hedging or protecting against risk. *Id.* at 218-20. Focusing on "the claimed advance over the prior art[,]" the accused infringer must show that "the claim's character as a whole is directed to" an abstract idea. *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (citation modified). To do so, it should contextualize the claim and draw upon analogies, where they exist, from prior cases. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016); *see also Veeva Sys. Inc. v. Tact.AI Techs., Inc.*, 2024 WL 2848335, at *4-5 (D. Del. June 5, 2024). "[W]hile the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to the claim language in identifying that focus." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). However, when looking at the claim's purported advance, we focus on the claim language read in light of the provided specification. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (citations omitted). While not dispositive, "a telltale sign of abstraction is when the claimed functions are mental processes that can be performed in the human mind or using a pencil and paper." *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1362 (Fed. Cir. 2023) (citation modified) (citation omitted).

When assessing the accused infringer's step one argument, we must keep in mind the key concern underlying the *Alice* analysis: that, by using generalized or sweeping terms, a claim will

preempt future innovation and preclude all practical applications of an abstract idea in an entire area. *Aon Re, Inc. v. Zesty.Ai, Inc.*, 791 F. Supp. 3d 531, 536 (D. Del. 2025) (citing *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1315 (Fed. Cir. 2016)). This concern is particularly pronounced where a patent involves computer-implemented systems and methods. *Id*. But, in attending to this concern, we also must take care not to "oversimplify[] the claim[] because at some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (citation modified) (citations omitted). Thus, especially in cases involving computers, we should "distinguish between claims that merely harness generic computing tools to lay claim to an abstract idea, and those that marshal those tools in a specific, structured way to solve a concrete technological problem." *Aon*, 791 F. Supp. 3d at 536 (citation omitted).

Claims describing routine steps and invoking generic computer tools, without identifying how that technology is applied in any specific or inventive manner, are typically deemed abstract. *Id.* at 537 (citing *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1211-13 (Fed. Cir. 2025); *Int'l Bus. Machs. Corp. v. Zillow Grp.*, 50 F.4th 1371, 1380-82 (Fed. Cir. 2022); *ChargePoint*, 920 F.3d at 768-70). Meanwhile, claims solving particular technical problems — by, for example, making specific improvements to computer, software, or network functioning that are useful for applying those technologies — typically are deemed patent eligible. *Id.* (citing *McRO*, 837 F.3d at 1315-16*; Koninklijke KPN N.V. v. Gemalto M2M GmbH ("KPN")*, 942 F.3d 1143, 1151-52 (Fed. Cir. 2019); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1371-72 (Fed. Cir. 2020)). Indeed, Federal Circuit precedent clearly establishes "that software can make patent-eligible improvements to computer technology, and related claims are eligible as long as

they are directed to non-abstract improvements to the functionality of a computer or network platform itself." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020) (citation omitted).

In essence, we ask: do "the claims recite more than a result-oriented goal or functional description" and instead "provide solutions in specific, non-conventional, or technical ways[?]" *Aon*, 791 F. Supp. at 537. If the answer is yes, the claim tends to be patent-eligible; if the answer is no, the opposite tends to be true. If the accused infringer fails to demonstrate that the claim is directed to an abstract idea or other patent-ineligible concept, then our inquiry ends there. If the accused infringer prevails, then we proceed to *Alice* step two.

At step two, the accused infringer must demonstrate that the claim does not contain an "inventive concept" (*i.e.*, that there are no additional elements to the claim "sufficient to transform the abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (citation modified). "Whether a combination of claim limitations supplies an inventive concept that renders a claim 'significantly more' than an abstract idea to which it is directed is a question of law." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018). But "whether a claim limitation or combination of limitations is well-understood, routine, and conventional is a factual question." *Id.* (citation omitted). The inventor cannot survive *Alice* step two simply by stating the abstract idea and adding the words to the effect of "apply it." *Alice*, 573 U.S. at 221 (citation omitted). For example, a method for measuring metabolites in the bloodstream to calibrate the proper dosage of thiopurine drugs for autoimmune disease treatment was deemed patent-ineligible because methods for determining metabolite levels were already "well known in the art" and the claimed process merely constituted "an instruction to doctors to apply the

11

applicable laws when treating their patients." *Id.* at 221-22 (citation omitted). It is not enough to simply append conventional steps, specified using a high level of generality; nor can one circumvent the prohibition against patenting abstract ideas by limiting the idea's use to a specific technological environment. *Id.* at 222 (citations omitted). Nor is it enough for claims to (1) "amount to no more than performing the abstract idea of parsing and comparing data with conventional computer components"; (2) "simply recite[] the use of generic features . . . as well as routine functions . . . to implement the underlying idea"; or (3) simply "narrow or reformulate[] an abstract idea" with a "non-routine or unconventional" element, without more. *BSG*, 899 F.3d at 1290-91 (citation modified) (citations omitted). But a claim may be patentable if, even though it uses a well-known mathematical equation, it does so in a process designed to fix a technological problem in "conventional industry practice" and thus improves an existing technological process. *Alice*, 573 U.S. at 223 (citation omitted). Again, in the context of computers, we should essentially ask whether each step merely "require[s] a generic computer to perform generic computer functions" and, if the answer is yes, then it is patent ineligible. *Id.* at 225. Finally, there is a key difference between improving the **result** of a human-driven process and making a non-abstract improvement of the **process** itself. *Inmar Brand Sols., Inc. v. Quotient Tech. Inc.*, 730 F. Supp. 3d 81, 89 (D. Del. 2024) (citation omitted). The former is generally patent ineligible, while the latter is generally patent eligible.

## B.    Willful infringement

The Patent Act enables courts to award enhanced damages "for egregious infringement behavior" — which the Supreme Court has described as conduct that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate."

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016) (citation omitted); 35 U.S.C.

§ 284 ("In either event the court may increase the damages up to three times the amount found or

assessed.").  Delaware courts distill the willful infringement pleadings requirement down to three

elements, which require that the accused infringer (1) knew of the patent; (2) infringed that

patent after it became aware of its existence; and (3) knew, or should have known, its conduct

constituted infringement.  *Cold Spring Harbor Lab'y v. Guardant Health, Inc.*, 2025 WL

2898942, at *4 (D. Del. Oct. 10, 2025); *Disruptive Res., LLC v. Ballistic Barrier Prods. Inc.*,

2025 WL 2879447, at *10 (D. Del. Oct. 9, 2025); *Valinge Innovation AB v. Halstead New*

*England Corp.*, 2018 WL 2411218, at *13 (D. Del. May 29, 2018), *report and recommendation*

*adopted*, 2018 WL 11013901 (D. Del. Nov. 6, 2018).  One way to satisfy this pleading

requirement is to send a notice letter to the accused infringer — and include that letter as an

exhibit to the complaint — in which the inventor (1) names the asserted patents; (2) identifies the

allegedly infringing products; and (3) asserts that those products infringe those patents.[2]  *Jackson*

*v. Seaspine Holdings Corp.*, 2022 WL 610703, at *5 (D. Del. Feb. 14, 2022); *Cambria Cnty.*

*Ass'n for the Blind & Handicapped, Inc. v. Affordable Wire Mgmt., LLC*, 2024 WL 1328883, at

*2 (D. Del. Mar. 28, 2024); *Seoul Semiconductor Co. v. Tech. Consumer Prods., Inc.*, 2025 WL

2299798, at *1 (D. Del. Aug. 7, 2025).

## C.    Amendment of a complaint

Though the decision to grant or deny a party leave to amend is within our discretion,

---

[2] This aligns with the Federal Circuit's approach to the knowledge requirement regarding contributory infringement claims.  For example, at summary judgment, the Federal Circuit explained that the inventor must demonstrate that the accused infringer knew of the patent at issue and that its specific acts constituted infringement of that patent.  *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010).

*Foman v. Davis*, 371 U.S. 178, 182 (1962), we should freely give leave to amend "when justice

so requires." Fed. R. Civ. Pro. 15(a)(2); *United States ex rel. Schumann v. AstraZeneca Pharms.*

*L.P.*, 769 F.3d 837, 849 (3d Cir. 2014). Indeed, the Third Circuit recognizes a "policy favoring

liberal amendment" under Rule 15(a). *Dole v. Arco Chemical Co.*, 921 F.2d 484, 488 (3d Cir.

1990). But we may deny such leave when it is clear from the record that (1) the moving party

demonstrated undue delay, dilatory tactics, or bad faith; (2) amendment would be futile; or (3)

amendment would prejudice the nonmovant. *Schumann*, 769 F.3d at 849 (citation omitted). In

assessing a proposed amendment's futility, we utilize Rule 12(b)(6)'s legal sufficiency standard.

*Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000) (citations omitted).

## IV.    DISCUSSION

### A.    Claim 1 of the 007 patent constitutes patent ineligible subject matter because it is directed to the abstract idea of enabling users to directly modify GUIs in a simulation without affecting the underlying software and it lacks an inventive concept

Whatfix contends that claim 1 of the 007 patent is directed to the abstract idea of

"modification of a simulation through user interaction with graphical objects, as opposed to

modifying a simulation through other techniques (such as programming)." DI 20 at 12. It

analogizes claim 1 to the ineligible claims in *Simio*, where the claimed advance was "using

graphics instead of programming to create object-oriented simulations" in what fundamentally

amounted to a user-side improvement. *Id.* at 13-14 (citing *Simio*, 983 F.3d at 1359); DI 25 at 8.

It further asserts that the "modifying limitation" utilizes "generalized and result-based functional

language" and fails to provide any details about the modification — nothing regarding how to

perform the modification, define the file structure, change the file, or how to make the program

execution simulatable. DI 20 at 12 (citation modified). And it contends that claim 1's purported

14

improvement in the efficiency of the computer process for the user does not constitute an improvement in computer functionality.  *Id.* at 15 (citations omitted).  Whatfix compares the claim language to the ineligible *Simio* claim as follows:

| *Simio*'s "executable-process limitation" | '007 patent's "modifying" limitation |
|---|---|
| "an executable process to ***add a new behavior*** directly to an object instance of the one or more ***object instances*** without changing the object definition and the added ***new behavior is executed only for that one instance of the object***" | "***modifying*** the first file in response to a user interaction with a displayed one of the at least one respective graphical user ***interface object***, wherein a modified version of the at least ***the portion of the first execution of the program is simulatable*** based on the modified first file" |

*Id.* at 14.

Nor, Whatfix insists, does the modifying limitation provide an inventive concept because this limitation merely constitutes "the abstract idea itself—interacting with a simulated program to modify the simulation."  DI 20 at 16 (citation omitted).  In Whatfix's view, the claim language indicates the lack of an inventive concept, given its generalized, results-focused language and recitation of "purely conventional computing tools" — including a "processor," "simulations," "program," "object classes," and "user interfaces" deployed in their conventional manner — without any descriptions of "any new hardware or techniques, any new type or source of information, or . . . any inventive programming."  *Id.* at 17 (citation modified) (citation omitted).  Whatfix criticizes Assima for importing language and specifications into the claim language that do not exist in the claim.  DI 25 at 7-11.

Assima rejects Whatfix's position and instead emphasizes that claim 1 provides "an improvement to computer functionality by enabling new modes of software prototyping and user training without relying on conventional programming."  DI 24 at 17.  It explains that claim 1 solves the issue of inefficient and error-prone software development and training because its

15

system and method enables users to interact with a GUI object and directly modify it, without

needing to (1) "submit a design specification to a programmer to make modifications to the code

to the original software program"; or (2) "execute the underlying software." *Id.* at 8, 13-17. And

it urges that the claim language provides specific steps for achieving the invention: (1)

"executing a software program"; (2) "identifying a GUI object and its state during that

execution"; (3) "storing a simulation 'first file' that includes the GUI object, where the file is

'simulatable without execution of the program,'"; and (4) "allowing modification of the

simulation file via interaction with the simulated GUI object." *Id.* at 17-18 (citation modified).

Assima thus insists claim 1 is more analogous to the claim found eligible in *Core Wireless*

*Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), as opposed to the claim

found ineligible in *Simio*.[3]  *Id.* at 15-17.

     Even if claim 1 were directed to an abstract idea, Assima insists that claim 1 provides an

inventive concept because it "describes a specific, technologically-rooted solution to challenges

in maintaining accurate, editable simulations used for prototyping and training, moving beyond

---

[3] As with the eligible claim in *Core Wireless*, Assima avers that claim 1 constitutes "an improvement to computer functionality by enabling new modes of software prototyping and user training without relying on conventional programming" — specifically, the computer can create a software package simulation that users can more efficiently modify and test, without modifying the underlying software. *Id.* at 17. Assima contrasts claim 1 with the ineligible *Simio* claims, which Assima asserts (1) "were directed to a user-side improvement rather than an improvement in validating and testing simulated software itself"; (2) failed to provide specific steps for achieving any technical solution to the computing process; and (3) merely "automat[ed] a known mental process of programming (using graphics) in a conventional computing environment without providing a concrete technological improvement to the computer itself." *Id.* at 15-16. While the *Simio* patent simplified "how users create simulation objects using graphical input (i.e. a user-side improvement)," Assima insists the '007 patent established "a systematic process of capturing actual program execution data (including GUI elements), transforming it into a discrete, modifiable, and independently executable simulation file that mimics the original application's procedure (i.e. a software application-side improvement)." *Id.* at 16.

mere automation of abstract ideas" that enables "a user to modify and interact with the simulation file . . . without running or modifying the original software program." *Id.* at 18-19. Assima maintains that the claim creates a new system which "identifies and stores detailed descriptions of [GUI] object class instantiations associated with program states into a simulation file, making program execution simulatable without the original program" where the user directly can modify that simulation. *Id.* at 18. And it notes that the "automatic re-grabbing" enables the modified simulation file to automatically interact with the actual software application, capture the application's actual behavior, and thus allow the system to "perform[] a heuristic comparison of this newly captured data against the modified simulation" and "identify[] precise differences in object properties, values, or sequences to validate implementations." *Id.* (citation modified).

We agree with Whatfix and conclude that claim 1 of the 007 patent is directed to the abstract idea of enabling a user to directly modify GUIs in a simulation file without affecting the real, underlying software. Claim 1 and its accompanying description focus on that concept and little else. 007 patent at 22:28-49; Fig. 2; Fig. 6; Fig. 9. And Assima effectively concedes this. DI 24 at 15-17. As such, we must agree with Whatfix that there is simply no escape from *Simio*'s holding that the closely analogous 468 patent claim was abstract. Claim 1 is effectively indistinguishable from the "executable-process limitation" found abstract in *Simio*: there, the claim described a method whereby the user could (1) "add a new behavior directly to" (*i.e.*, in the 007 patent, "modify[]"); (2) "an object instance" (*i.e.*, in the 007 patent, "a [GUI] object"); (3) in a simulation "without changing the object definition [such that] the added new behavior is executed only for that one instance of the object" (*i.e.*, in the 007 patent, simulating the "first

execution of the program . . . without execution of the program"). *Simio*, 983 F.3d at 1357; 007 patent at 22:28-49; DI 20 at 13-14; DI 25 at 8.

And despite Assima's protests to the contrary, claim 1 recites no colorable improvement to computer functionality. Just as *Simio* determined that the 468 patent claim was distinguishable from claims that improved computer functionality, so too for claim 1 of the 007 patent. *Simio*, 983 F.3d at 1361 (distinguishing the 468 patent claim from the (1) *Enfish* claims which "were directed to a self-referential table that improved a computer's functionality by improving the way it stored and retrieved data in memory"; (2) the *McRO* claims which "used a combined order of specific rules to achieve an improved technological result"; and (3) the *KPN* claims which made "a technological improvement . . . over the prior art's ability to detect systematic errors" by providing a "specific implementation of varying the way check data is generated") (citing *Enfish*, 822 F.3d at 1336-39; *McRO*, 837 F.3d at 1315-16; *KPN*, 942 F.3d at 1150-51).

Claim 1 lacks any language specifying how to achieve the purported system and method. As Whatfix observes, claim 1 provides no description of how to perform the modification of a GUI object, let alone how to do so in a manner that ensures the modification is simulatable without affecting the underlying software. Rather, claim 1 uses entirely result-oriented, functional language tracking the abstract idea, listing routine steps, and invoking generic computer tools (*i.e.*, processors, programs, user interface objects, and files) — which is the hallmark of abstractness. *Aon*, 791 F. Supp. 3d at 537 (citations omitted); *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357-58 (Fed. Cir. 2023) (concluding the claim was abstract, in part, because it "fail[ed] to recite a specific solution to make the alleged

improvement . . . concrete" as it "lack[ed] sufficient recitation of how the purported invention improve[d] the functionality of video surveillance systems[.]"); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315-16 (Fed. Cir. 2016) (concluding that the claims did not improve computer functionality because they simply "use[d] generic computers to perform generic computer functions" and lacked any description regarding the mechanism for or restriction regarding how to go about achieving the desired result).

Assima analogizes claim 1 to *Core Wireless*, but claim 1 lacks a technological improvement of the sort identified by the Federal Circuit in *Core Wireless*. There, the Court concluded that the claims at issue were directed toward "an improved user interface for computing devices" rather than "the abstract idea of an index" given that (1) they were directed to a specific manner of presenting and summarizing information in electronic devices; (2) the claim language restricted the type of data that could be displayed in the summary; and (3) the claim language described "a specific manner of displaying a limited set of information to the user, rather than using conventional user interface methods to display a generic index on a computer." *Core Wireless*, 880 F.3d at 1362-63. In other words, the difference was that the *Core Wireless* claims described "a specific improvement over prior systems, resulting in an improved user interface for electronic devices." *Id.* at 1363 (citations omitted). Claim 1 of the 007 patent provides no such specificity. Moreover, the generic, result-oriented language of claim 1 signals that, even if its "executable limitation" constitutes a technological improvement, the lack of specificity regarding how to achieve that limitation demonstrates that this limitation does not transform "the claim's character as a whole from one directed to an abstract idea to one that's not." *Simio*, 983 F.3d at 1362 (citation modified) (citations omitted).

This lack of specificity in the claim language also dooms claim 1 at *Alice* step two. Again, claim 1 consists of result-oriented language and the conventional deployment of conventional computer tools. It does not describe in any level of detail any novel technique, hardware, or programming, suggesting that the claim pays "relatively little attention to the functionality reflected in the [purported inventive element]" and essentially attempts to rely upon the abstract idea itself to supply the necessary inventive concept. *Simio*, 983 F.3d at 1362-64 (assessing the claim at both *Alice* step one and two); *Hawk Tech.*, 60 F.4th at 1359 (concluding the claim failed step two because it merely "recit[ed] an abstract idea performed on a set of generic computer components."); *Eolas Techs. Inc. v. Amazon.com, Inc.*, 2024 WL 371959, at *6 (Fed. Cir. Feb. 1, 2024) (rejecting Eolas's argument that its claims recited an inventive concept of distributed processing because "the claims merely describe[d] a desired function or outcome without providing details of the claimed distributed processing."). Nor can Assima save claim 1 by pointing to details in the 007 patent's specification. *ChargePoint*, 920 F.3d at 766, 769 ("But while the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to the claim language in identifying that focus[]" and "the specification cannot be used to import details from the specification if those details are not claimed."); *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1379 (Fed. Cir. 2024) (same).

For these reasons, we conclude that claim 1 of the 007 patent is patent ineligible and thus dismiss, without prejudice, Assima's allegation that Whatfix infringed claim 1 of the 007 patent.

**B.      Claim 1 of the 948 patent is directed to the patent-eligible concept of creating a multi-display software system whereby the modification of a common element on**

**one screen automatically updates across all other screens containing that element**

As with the 007 patent, Whatfix insists that claim 1 of the 948 is directed to a patent-ineligible, abstract idea — here, "the arrangement and presentation of data (*i.e.*, user interfaces) in a simulated program." DI 20 at 19. Whatfix maintains that the "[o]rganization of data for display to users is an abstract idea[,]" pointing to cases such as *Broadband iTV, Inc. v. Amazon*, 113 F.4th 1359 (Fed. Cir. 2024), as examples where the Federal Circuit determined that a claim directed to "receiving metadata and organizing the display of video content based on that metadata is abstract." *Id.* at 20 (citation modified) (*citing Broadband*, 113 F.4th at 1368). Nor, Whatfix declares, does claim 1 provide any structural or functional improvement to the user interface; instead, it simply "arrang[es] content in a particular order" and enhances the user experience. *Id.* at 20-22 (citation modified) (citations omitted). Whatfix further asserts that Assima cannot overcome *Alice* by relying upon templates because Assima did not allege that the 948 patent's advance was the use of templates or a new template type.[4] *Id.* at 22 (citations omitted). Moreover, Whatfix criticizes claim 1 for its "functional, results oriented language" and lack of description of how to perform its claimed steps, such as how to: (1) trigger the triggering events; (2) obtain and process the data structures; or (3) instantiate and output the screen

---

[4] Whatfix criticizes what it views as "Assima's shifting arguments" regarding claim 1, asserting that the complaint's focus was on the "organization and display of graphical information" rather than templates or their hierarchical composition. DI 25 at 11 (citations omitted). Even if the alleged advance was the hierarchical composition of templates, Whatfix urges that claim 1 lacks any specificity regarding how to create the instantiation process and recounts that the "use of templates to generate interfaces or other documents is an abstract idea[.]" *Id.* at 11-12 (citations omitted). Again, Whatfix insists that the 948 patent merely strives to enhance user, not computing, efficiency. *Id.* at 13 (citations omitted). It further maintains that "templates" constitute "generic computer function[s] or data type[s]" and that any alleged benefits of the invention are not tied to claim 1's language. *Id.* at 14 (citations omitted).

templates for display.  *Id.* at 22-23.

Assima rejects Whatfix's characterization, asserting that claim 1 "is directed to a technological solution to modifying software technology that has different display screens by allowing different display screens to be linked, modified, and displayed at the same time."  DI 24 at 20.  Thus, Assima insists that claim 1 is fundamentally distinct from claims that essentially "arrang[ed] content in a particular order" (and were thereby abstract) because, in its view, claim 1 is more like the eligible claims from *Core Wireless* and *Data Engine Technologies LLC v. GOOGLE LLC*, 906 F.3d 999 (Fed. Cir. 2018) — claims that improved the technology associated with user interfaces.  *Id.* at 21-22 (citation modified) (citations omitted).  And Assima insists that claim 1 includes "specific concrete steps" for achieving this system, such as (1) "obtaining specific data structures for screen templates and graphical objects based on different triggering events"; and (2) "outputting a display screen combining the different display screens and graphical objects."  *Id.* at 22.

Regarding *Alice* step two, Assima asserts that claim 1 "is directed to an inventive concept because it describes a specific, technologically-rooted solution to a recognized problem of managing and modifying numerous large numbers of user interface display screens[.]"  *Id.* Assima insists that claim 1 "details a concrete computer-implemented method that utilizes a novel, structured approach to managing display screens through a system of reusable 'screen templates' and 'instantiation data structures' with pointers[,]" noting that the claim delineates "how a processor (1) obtains a first data structure pointing to a first screen template, (2) processes and displays this template, and critically, (3) obtains a second data structure for a second display that points to the first template, and then (4) processes and displays the second

screen by explicitly including the instantiation of the first template." *Id.* According to Assima, the "hierarchical referencing and instantiation paradigm" constitutes a concrete, technical improvement for the construction and manipulation of complex GUIs — an improvement that "go[es] beyond the conventional use of a computer" because it (1) enables consistent, centrally modifiable updates that can be reflected, from a single screen template, across multiple instances; which (2) streamlines, speeds up, and makes more accurate "the process of maintaining and updating user interfaces across complex systems[.]" *Id.* at 22-23.

Assima has the better position for the 948 patent. User interface inventions tend to run afoul of *Alice* when they address general problems with organizing and presenting data for user interaction. But other user interface inventions are unique to the computer environment and solve problems introduced by computers — problems that do not even exist outside of computers. To that end, Whatfix's characterization of claim 1 is overly simplistic because claim 1 is not directed to merely "the arrangement and presentation of data (*i.e.*, user interfaces) in a simulated program." DI 20 at 19. Rather, as Assima helpfully clarifies, claim 1 focuses on providing a technological solution for existing software consisting of different display screens, whereby the user can modify a common element on one display screen (the parent template) that then automatically updates across all other display screens (the children templates) containing that element. DI 24 at 20; DI 35 at 68-70. Contrary to Whatfix's assertion, this claim is not simply about the display or organization of information: it is about creating a system — here, "a hierarchy of user interface templates" — that enables users to "easily modify common elements [in a software program] without having to go through every user interface object." DI 35 at 69. This constitutes a specific solution to a specific, computer-related problem, rather than a patent-

ineligible, abstract idea.

As such, we find claim 1 to be clearly distinguishable from cases involving patents directed to the organization and display of information. In *Broadband*, the Federal Circuit determined that the claims of one of the patents at issue (the 026 patent family claims) were directed to the abstract idea of "receiving metadata and organizing the display of video content based on that metadata." *Broadband*, 113 F.4th at 1368. Assessing the claim language, it noted that the patent "recite[d] an electronic program guide that is automatically created using metadata that was uploaded to a [server] by a content provider" and that "the claimed metadata determine[d] the respective hierarchical location of a respective title of the video content within the electronic program guide to be displayed." *Id.* at 1367-68 (citation modified). The Court also examined the specification, which acknowledged "the need to enable home TV viewers to find something of interest for viewing among the vast numbers of new programs" and the inventor's claimed advance of "using a computer to generate a programming guide that automatically list[s] the title of the video content in an electronic program guide according to metadata uploaded by a content provider." *Id.* at 1368 (citation modified). In the Court's view, this patent was "substantively similar" to other patent-ineligible claims involving the collection and organized display of information. *Id.* (concluding that the "claims are directed to receiving and displaying information like *Electric Power Group* and organizing information based on classification information like *TLI*.") (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d

1350, 1351 (Fed. Cir. 2016);[5] *TLI*, 823 F.3d at 609-610)[6].  And the Court reasoned that, unlike the claims in *Core Wireless* and *Data Engine*[7] — which were "directed to an improved structure or function of a user interface" and which provided "a specific, technological solution to a technological problem" — this claim simply "[r]eordered content within a user guide[,]" rather than offered a "technological solution to a technological problem[.]"  *Id.* at 1368-69 (citation modified) (citations omitted).

But, again, claim 1 of the 948 patent is not simply directed to the display and organization (hierarchical or otherwise) of information.  And unlike the claims discussed above, which were directed to abstract ideas, claim 1 provides a specific technological solution (hierarchically linked templates) to solve a specific technological problem (the inefficiencies and inaccuracies involved in the development of software containing various display screens).  *See, e.g.*, *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1004-05 (Fed. Cir. 2017); *Core Wireless*, 880 F.3d at 1363; *Data Engine*, 906 F.3d at 1007-08.  We find this akin to the patents

---

[5] In *Elec. Power*, the Federal Circuit held the claims at issue were directed to the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis" without providing "any particular assertedly inventive technology for performing those functions."  *Elec. Power*, 830 F.3d at 1353-54.

[6] In *TLI*, the Federal Circuit concluded that the claims at issue were "directed to the abstract idea of classifying and storing digital images in an organized manner and fail[ed] to add an inventive concept sufficient to confer patent eligibility."  *TLI*, 823 F.3d at 611.  In the Court's view, the claims focused on "the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflect[ed] an inventive solution to any problem presented by combining the two."  *Id.* at 612.

[7] In *Data Engine*, the Federal Circuit determined that claims directed toward a "specific method for navigating through three-dimensional electronic spreadsheets" were not abstract given that the specification identified faults and technical issues regarding computer spreadsheets and provided a particular solution to that "known technological problem."  *Data Engine*, 906 F.3d at 1007-08 (citation modified).

in *Trading Techs* where the Federal Circuit determined that the patents went above the mere display of information upon a graphical user interface because they "require[d] a specific, structured graphical user interface paired with a prescribed functionality directly related to the graphical user interface's structure that [was] addressed to and resolve[d] a specifically identified problem in the prior state of the art[.]" *Trading Techs.*, 675 F. App'x at 1004.  Similarly, as in *Core Wireless*, claim 1 provides "a specific improvement over prior systems" involving "electronic devices" — here, a specific improvement over the prior software development system for software with multiple display screens.  *Core Wireless*, 880 F.3d at 1363 (citations omitted).

This also distinguishes claim 1 from the claims found ineligible in *Ameranth* — and district court cases following *Ameranth*.[8]  *Ameranth, Inc. v. Domino's Pizza, LLC*, 792 Fed. Appx. 780 (Fed. Cir. 2019).  There, the Federal Circuit concluded that the claims were directed toward "configuring and transmitting hospitality menu related information using a system that is capable of synchronous communications and automatic formatting" which, without more, was an abstract idea.  *Id.* at 786-87 (citation omitted).  But claim 1 of the 948 patent goes beyond the

---

[8] *See, e.g.*, *Ameranth, Inc. v. Doordash, Inc.*, 2025 WL 3267360, at *5, *7 (D. Del. Nov. 24, 2025) (concluding that the patent's claimed improvement to the specific master menu file structure type failed to constitute an improvement to computer technology because it "merely computerize[d] a pen-and-paper ordering system" for "reserving orders or appointments."); *Topia Tech., Inc. v. Egnyte, Inc.*, 2023 WL 2734607, at *3-*4 (D. Del. Mar. 31, 2023) (finding abstract a system focused "on the concept of automatically transferring computer files from one electronic device to another so that the respective three devices all contain the same modified and updated versions of those files" because the claim language (1) "read[] as if it [was] all about the abstract idea at issue[—]synchronizing multiple versions of a file across network computers[—]and not on some more specific or particularized real-world application of that idea"; (2) used "highly generalized, result-oriented terms"; (3) sought to automate "otherwise manual processes using generic computers"; and (4) "focused on the general concept of automatically transferring modified electronic files between network devices[.]").

*Ameranth* claim's concept: again, claim 1 creates a system whereby users can modify a common element on one display screen in a multi-display screen software system, and that modified element then automatically updates across all other screens containing that element. This provides a technological improvement to the software development process itself, because it makes the process more efficient and accurate, rather than a mere improvement to the user's experience. And claim 1 also provides specific details for implementing this system and method: (1) the process starts with the user triggering the execution of the software program; (2) a first user interface display screen then automatically pops up; (3) the computer processor then obtains "a first instantiation data structure" which includes a pointer that links to the first screen template, where that template is stored in an accessible manner to the processor; (4) the processor then processes the first instantiation structure by "obtaining and instantiating the first screen template[,]" which is linked "by the first instantiation structure[,]" and outputs the instantiated first screen template in a display device; (5) the process repeats when the user triggers the display of a second user interface display screen during the execution of the software program, where the second instantiation structure obtained by the processor contains a link (via a pointer) to the first screen template; such that (6) the outputted "instantiated second screen template" includes the applicable modifications made in the first instantiated screen template. 948 patent at 17:47-18:15. In this manner, claim 1 describes both the desired outcome and *how* to achieve that outcome, in contrast to *Ameranth* and its successors. *See, e.g.*, *Ameranth*, 792 Fed. Appx. at 786-87; *Topia*, 2023 WL 2734607 at *3-*4.

For these reasons, we conclude that claim 1 is not directed to an abstract idea, such that we need not proceed to *Alice* step two. Accordingly, we deny Whatfix's motion to dismiss with

respect to claim 1 of the 948 patent.

## C.    Assima sufficiently pled willfulness

Whatfix argues that Assima failed to plausibly allege willful infringement.  DI 20 at 25-28.  It contends that Assima's pre-suit notice letter failed to include allegations of willful infringement because the letter did not (1) identify a specific claim; (2) address claim language; or (3) map how Whatfix's products satisfied such language.  *Id.* at 25.  Whatfix highlights that, after Whatfix requested additional details of Assima's infringement theory and exemplary claim charts, Assima declined to share such details.  *Id.* at 25-26.  Nor, Whatfix maintains, do "Assima's conclusory copying allegations" in its complaint suffice to allege willful infringement because the complaint fails to (1) "provide any evidence or facts to support its claim that Assima's product practices any claim"; (2) provide any "limitation-by-limitation analysis"; (3) allege that Assima Train practices the claim asserted in the complaint; nor (4) allege which Assima Train features Whatfix purportedly copied.  *Id.* at 27-28 (citation modified).  In Whatfix's view, its cases[9] should govern this issue.  DI 25 at 14-15 (citation omitted).

Assima stands by its pleading of willfulness.  DI 24 at 23.  Assima points out that its notice letter was referenced in the complaint's body and attached as an exhibit, and it explains that the letter states that Whatfix's Mirror infringes the 007 and 948 patents because Whatfix copied Assima Train.  *Id.* at 23.  Assima maintains that the law is clear: as a patent owner, it did not need to provide in its infringement notice letters detailed infringement claim charts to satisfy

_____

[9] Specifically, Whatfix cites *Bench Walk Lighting LLC v. LG Innotek Co.*, 530 F. Supp. 3d 468 (D. Del. 2021), *Dynamic Data Techs. v. Google LLC*, 2020 WL 1285852 (D. Del. Mar. 18, 2020), report and recommendation adopted, 2020 WL 3103786 (D. Del. June 11, 2020), and *Deere & Co. v. AGCO Corp.*, 2019 WL 668492 (D. Del. Feb. 19, 2019).  DI 20 at 26-27.

the willfulness standard.  *Id.* at 23-24 (citing *Cambria Cnty. Ass'n for the Blind & Handicapped, Inc. v. Affordable Wire Mgmt., LLC*, 2024 WL 1328883, at *2 (D. Del. Mar. 28, 2024)).  And Assima asserts that Whatfix's cases claiming the contrary are distinguishable because the alleged notice letters in such cases either (1) were not provided as exhibits with the complaint; or (2) listed an entire portfolio of patents but did not accuse any products of infringing specific patents, nor identify specific asserted patents and infringing products.  *Id.* at 24 (citations omitted).  Assima further declares that its copying allegations, combined with the notice letter, are sufficient for willfulness at the pleadings stage.  *Id.* at 25 (citations omitted).  In its view, it is sufficient to allege in the complaint, for purposes of alleging willfulness, that "What[f]ix intentionally 'decided to copy patent-protected Assima's Train product based on the product details disclosed on Assima's website[.]'"  *Id.*

We agree with Assima that it has more than sufficiently pled willful infringement by Whatfix.  Multiple courts in this district have found willful infringement sufficiently pled when the inventor sent a notice letter to the accused infringer (1) naming the asserted patents; (2) identifying the allegedly infringing products; and (3) asserting those products infringed such patents.  *Jackson*, 2022 WL 610703 at *5; *Cambria*, 2024 WL 1328883 at *2; *Seoul*, 2025 WL 2299798 at *1.  This is exactly what Assima did here, as its letter to Whatfix asserted that Whatfix's Mirror product was infringing Assima Train because it was a virtual copy of Assima Train.  DI 1-3 at 2-3.  Nothing more was required to plead willful infringement, and Whatfix has not convinced us that the strict rule it proposes finds purchase in law or logic.[10]  Accordingly, we

---

[10] Whatfix's purported authority, which it asserts demonstrate that more specificity is required at the pleadings stage, is easily distinguishable.  In *Bench Walk*, defendants received an

conclude that Assima has sufficiently pled willful infringement by Whatfix and therefore deny

Whatfix's motion to dismiss on this ground.

**D.     Assima has leave to amend and Assima's allegations that Whatfix infringed claims other than claim 1 of the 007 patent are not dismissed.**

To the extent that we discern any deficiencies in its complaint, Assima requests leave to

amend.  DI 24 at 25.  In reply, Whatfix urges us to deny such leave because Assima "has not

identified any alleged facts that could be pleaded that would cure the deficiencies in its

complaint and therefore has failed to provide any assurance that amendment would be anything

other than futile."  DI 25 at 15 (citation modified) (citations omitted).  We disagree with

Whatfix.  Although it is unclear exactly what Assima might plead to overcome Whatfix's

arguments on patent eligibility for claim 1 of the 007 patent, in light of the Third Circuit's

"policy favoring liberal amendment[,]" we grant Assima leave to amend.  *Dole*, 921 F.2d at 488.

There is also the lingering question of how to handle the other claims of the 007 patent.

Whatfix's position is that Assima asserted only claim 1, and since we held that claim invalid, the

007 patent must be dismissed entirely.  DI 35 at 27-30.  But we disagree with that, too.

For one, we are not persuaded that Assima alleges infringement of only claim 1 of the

asserted patents in its complaint.  Though Assima certainly focuses upon claim 1 of the 007 and

---

unsigned letter from plaintiff after the infringement suit was filed, which (1) was only addressed to one of the accused infringers; (2) failed to identify two of the patents-in-suit; (3) did not reference most of the allegedly infringing products; and (3) failed to describe how those products allegedly infringed the patents. *Bench Walk*, 530 F. Supp. at 477-78.  The letter in *Dynamic Data* sent by the inventor to the accused infringer included a list of approximately 400 patents, only ten of which were patents-in-suit.  *Dynamic Data*, 2020 WL 1285852 at *1.  And in *Deere*, the notice letter not only was not attached to the complaint nor amended complaints, but the complaints did not sufficiently allege that the letter (1) identified the allegedly infringing products; (2) explained how those products infringed the asserted patents; nor (3) was even received nor known by the accused infringer.  *Deere*, 2019 WL 668492 at *6.

948 patents, it expressly notes that those claims are examples of Whatfix's alleged infringement — rather than the sole bases for infringement. *See, e.g.*, DI 1 at ¶¶ 27, 30, 36, 76 (discussing the respective claim 1's as "example[s]" of infringement). Assima also specifically alleges that "[i]ndependent claims 21-23 and 27 of the 007 patent also recite unconventional technological advancements over the prior art that are similar to the unconventional technological advancements recited in independent claim one." *Id.* at ¶ 29. Nor does *Hantz* require the result sought by Whatfix.[11] In *Hantz*, the operative complaint alleged that the accused infringer infringed claims 1 and 31-33 of each of its asserted patents, as well as "one or more claims" of those patents. *Hantz*, 2023 WL 2569956 at *1. The Federal Circuit, in affirming the district court's decision that those claims were patent-ineligible, determined that this ineligibility judgment only applied to claims 1 and 31-33 because the complaint only asserted infringement of those claims. *Id.* However, two other factors likely contributed to the Federal Circuit's determination: (1) the complaint stated that the infringement was "detailed in Exhibit C" to the complaint, and that exhibit provided infringement claim charts solely for claims 1 and 31-33; and (2) Hantz itself stated that the only claims before the court were claims 1 and 31-33 and that no dependent claims were asserted nor before the court. *Id.* (citations omitted). Here, Assima did not include an impliedly exclusive claim chart detailing only claim 1 of the 007 and 948 patents. DI 1. Nor does Assima assert that its complaint is limited to claim 1 of the respective patents, instead maintaining that claim 1 is merely exemplary for each patent. DI 24 at 12; DI 35 at 44-45. We thus conclude that, construed in its entirety and in the light most favorable to Assima, Assima asserted infringement of more than just claim 1 of the 007 and 948 patents.

---

[11] It also may be noted that *Hantz* is a very brief, non-precedential opinion.

Because the complaint asserted infringement of claims other than claim 1 of the 007 patent, the 007 patent is not dismissed, and the case will move forward on that patent.

**V.      CONCLUSION**

For the above reasons, Whatfix's motion to dismiss is granted without prejudice for claim 1 of the 007 patent because that claim is patent ineligible; denied for claim 1 of the 948 patent because that claim is patent eligible; and denied for willful infringement.  To be clear, the judgment of invalidity for the 007 patent applies only to claim 1 of the 007 patent, and the 007 patent is not otherwise dismissed from the case.  Assima has leave to amend.